IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CORINTHIA KIMBROUGH MOBLEY,
and KIM D. MOBLEY, as Administrators
of the Estate of Coron Bond, Deceased,
        Plaintiffs,

v.                                                                      Civil Action No. 3:19-cv-866

PILOT TRAVEL CENTERS, LLC,
d/b/a PILOT FLYING J,
        Defendant.

## OPINION

In 2017, Jules Moultrie shot and killed twenty-year-old Coron Bond at the Pilot Travel Center in Disputanta, Virginia. Bond's parents, as administrators of his estate, have sued Pilot Travel Centers, LLC ("Pilot"), asserting that Pilot failed to protect Bond from Moultrie's murderous act. Pilot has moved to dismiss the plaintiffs' amended complaint,[1] arguing that it had no duty to protect Bond from an unforeseeable criminal act of a third party. Because Virginia law does not impose a duty to protect under these circumstances, the Court will grant the motion to dismiss.

## I. FACTS ALLEGED IN THE AMENDED COMPLAINT

A large and confusing cast of characters participated in the tragic events in this case. The case arises from a workplace feud between two employees at a Wendy's restaurant at a Pilot Travel Center.[2] (Am. Compl. ¶¶ 8, 10.) The important people fall into three groups: (1) the victim and

---

[1] Following a hearing on February 19, 2020, the Court granted Pilot's motion to dismiss the plaintiffs' initial complaint for failure to state a claim. (Dk. No. 20.) The Court also granted the plaintiffs leave to file an amended complaint.

[2] Pilot owned and operated the Wendy's restaurant. (Am. Compl. ¶ 3.)

his girlfriend, (2) the perpetrator and his compatriots, and (3) the Wendy's staff. For ease of reference, the Court lists the main participants by group:

**The victim and his girlfriend:**

Coron Bond: the victim, and the boyfriend of My'Keyah Oliver, a Wendy's employee. (*Id.* ¶ 8.)

My'Keyah Oliver: Wendy's employee, feuding with Norma Glover, another Wendy's employee. (*Id.*)

**Perpetrator and associates:**

Jules Moultrie: Bond's murderer. (*Id.* ¶ 42.)

Norma Glover: Wendy's employee, feuding with Oliver; Moultrie's half-sister. (*Id.* ¶¶ 10, 12.)

Tatiyana Wright: Wendy's employee, apparently a friend of Glover. (*Id.* ¶¶ 13, 14.)

Mamie Salley: Glover's mother. (*Id.* ¶ 19.)

**Pilot staff:**

Robinette Nicholas: Wendy's manager. (*Id.* ¶ 27.)

Joshua Nunnally: Wendy's drive-thru employee. (*Id.* ¶¶ 13, 35.)

\* \* \*

The events unfolded at the Wendy's restaurant and on phone calls among Moultrie's associates. On the day of the murder, Bond drove his girlfriend, My'Keyah Oliver, to work at the Wendy's restaurant. (*Id.* ¶ 8.) The previous day, Oliver had reported Norma Glover to Wendy's management for clocking out early. (*Id.* ¶ 10.) Angry about the clocking out incident, Glover confronted Oliver in the parking lot. (*Id.*) While Bond and Oliver sat in their car, Glover approached them, banged on the window, and verbally threatened and accosted Oliver. (*Id.*)

Things must have calmed down some, because eventually Oliver went inside Wendy's to work. (*Id.* ¶ 11.) Bond waited outside for a friend to meet him at the restaurant. (*Id.*)

At some point, Glover (or someone on her behalf) arranged for her half-brother, Moultrie, to come to the Wendy's to take some action on behalf of Glover. (*Id.* ¶ 12.) Glover spoke loudly about "brown shooters" coming to Wendy's to cause trouble, apparently for Oliver. (*Id.* ¶ 16.) She said that they would "pistol whip" Oliver. (*Id.* ¶ 12.) The amended complaint says that four employees could have heard Glover's comments. (*Id.* ¶ 13.)

For obvious reasons, Glover did not alert management about Moultrie's forthcoming arrival. (*Id.* ¶ 24.) The only warning to Wendy's management came from Oliver. (*Id.* ¶ 27.) After overhearing Glover's comments in the parking lot, Bond went inside the travel center to tell Oliver about Glover's plans. (*Id.* ¶ 25.) Oliver, in turn, told Robinette Nicholas, the manager on duty, about Glover's threats, including the "brown shooters" language. (*Id.* ¶ 27.) She also said that Glover remained in the parking lot. (*Id.*) The manager said that she would take care of the matter and send Glover home. (*Id.* ¶ 28.) The manager did not call the police, tell Glover to leave, or take any other measures to respond to the threat. (*Id.* ¶ 30.)

Afraid for Glover's safety, Bond decided to wait inside the travel center for a while. (*Id.* ¶ 26.) He ordered fries and sat in a booth. (*Id.* ¶ 29.) Forty-five minutes after Oliver told the manager about the phone call, Moultrie walked into the travel center with Glover. (*Id.* ¶ 34.) While working the drive-through window, Joshua Nunnally, a Pilot employee, saw Moultrie wearing an all-black hoodie, "appearing as if Moultrie was clutching something that looked like the magazine to a firearm." (*Id.* ¶ 35.)

As Moultrie and Glover walked inside the travel center, Glover pointed at Bond and said, "That's him, that's him right there." (*Id.* ¶ 39.) Glover then told Moultrie, "That's her boyfriend."

(*Id.* ¶ 40.) Moultrie said to Bond, "I heard you have a problem with my sister." (*Id.* ¶ 41.) Before Bond could respond, Moultrie shot Bond in the chest. (*Id.* ¶ 42.) Bond ran toward the exit. (*Id.* ¶ 43.) Moultrie again shot Bond, this time in the back. (*Id.*) Bond collapsed by the Wendy's entrance and later died at the scene. (*Id.* ¶¶ 43, 46.)

The amended complaint discusses in detail the interactions between Tatiyana Wright, another Wendy's employee, and Glover. (*Id.* ¶¶ 13-16, 19-24.) When Bond and Oliver were in the parking lot, Wright was waiting in Glover's car for a ride home from work. (*Id.* ¶ 14.) She not only saw Glover's confrontation with Oliver, but also observed Glover's continuing anger with Oliver. (*Id.* ¶¶ 14-15.) Wright called Mamie Salley, Glover's mother, to tell her about the confrontation. (*Id.* ¶ 20.) At some point, Glover joined the phone call between Wright and Salley. (*Id.* ¶ 15.)

During the phone call, Glover told Salley that Moultrie and her cousin would be coming to the restaurant to "pistol whip" Oliver. (*Id.* ¶¶ 12, 15.) Glover also told Salley that "brown shooters" would be coming to the travel center. (*Id.* ¶ 15.) Before Wright ended the phone call, Salley told Wright, "[W]ord up, say no more." (*Id.* ¶ 21.) This ambiguous statement is apparently ominous. Salley then called Moultrie, Glover's half-brother who had recently been released from prison after killing his father. (*Id.* ¶¶ 21, 23.)

At some point, Wright told Glover, "Mamie don't play." (*Id.* ¶ 22.) According to the plaintiffs, this indicates that "Wright specifically knew that Glover was conspiring to have gunmen come to the [t]ravel [c]enter to commit an assault." (*Id.* ¶ 24.) While Wright knew all about the exchange between Glover and Salley, she was off duty and never shared this with Wendy's management. (*Id.* ¶¶ 14, 24.)

The plaintiffs assert a wrongful death claim against Pilot under Virginia law. The plaintiffs contend that Pilot—through its employees—knew of an imminent probability of harm to its customers but failed to take any action to protect Bond from Moultrie's criminal act. Pilot has moved to dismiss for failure to state a claim, arguing that no legal duty to protect arose under the circumstances.

## II. **DISCUSSION**[3]

### A. *The Duty to Protect Against Criminal Acts*

Under Virginia law, "[a]s a general rule, there is no duty to warn or protect against acts of criminal assault by third parties." *Terry v. Irish Fleet, Inc.*, 296 Va. 129, 135, 818 S.E.2d 788, 792 (2018). Indeed, "under 'ordinary circumstances, acts of assaultive criminal behavior by third persons cannot reasonably be foreseen.'" *Id.* (quoting *A.H. Rockingham Publ'g Co.*, 255 Va. 216, 222, 495 S.E.2d 482, 486 (1998)). The Supreme Court of Virginia, however, has identified two "rare circumstances" that operate as exceptions to the general rule against liability for the criminal acts of third parties.

Here, the plaintiffs invoke the second "rare circumstance," which "involves a duty not assumed but imposed." *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 619, 831

---

[3] Pilot has moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the merits of the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not apply to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

S.E.2d 460, 468-69 (2019). Under the second exception, a duty to protect arises "when a special relationship exists '(1) between the defendant and the third person which imposes a duty upon the defendant to control the third person's conduct, or (2) between the defendant and the plaintiff which gives rise to protection to the plaintiff.'" *Id.* at 619, 831 S.E.2d at 469, (quoting *Brown v. Jacobs*, 289 Va. 209, 215, 768 S.E.2d 421, 425 (2015)). Here, the plaintiffs argue that Pilot had a duty to protect Bond because a special relationship existed between Pilot and Bond.

The duty exists only "when the defendant could have foreseen the need 'to take affirmative action to protect [the plaintiff] from harm.'" *Id.* at 620, 831 S.E.2d at 469 (quoting *Burns v. Gagnon*, 283 Va. 657, 669, 727 S.E.2d 634, 669 (2012)). Additionally, "[t]he degree of foreseeability required 'depends on the nature of the special relationship.'" *Id.* (quoting *Commonwealth v. Peterson*, 286 Va. 349, 357, 749 S.E.2d 307, 311 (2013)). For example, "a business invitee does not entrust his safety to a business invitor to the same extent a passenger does to a common carrier." *Wright v. Webb*, 234 Va. 527, 532, 362 S.E.2d 919, 922 (1987). "[T]he finding of a special relationship is a 'threshold requirement.'" *Terry*, 296 Va. at 136, 818 S.E.2d at 792 (quoting *Brown*, 289 Va. at 215, 768 S.E.2d at 425).

A "special relationship" exists "between a business owner and an invitee." *A.H. ex rel. C.H.*, 297 Va. at 620, 831 S.E.2d at 469. A business owner has a duty to take measures to protect an invitee from a criminal assault when the business owner either (1) "attract[s] or provide[s] a climate for assaultive crimes," or (2) "knows that criminal assaults against persons are occurring, or are about to occur, on the premises which indicate an imminent probability of harm to an invitee." *Wright*, 234 Va. at 533, 362 S.E.2d at 922. Here, the plaintiffs contend that Pilot knew of "an imminent probability of harm" to a customer. *Id.*

### B. *Application to Pilot*

To show that Pilot knew of an "imminent probability of harm" to a customer, the plaintiffs essentially rely on the following allegations.[4] First, four Pilot employees overheard Glover make threatening comments while speaking on the phone to her mother. Specifically, Glover told her mother that someone would be coming to the travel center to "pistol whip" Oliver and that "brown shooters" would be coming to the travel center. (Am. Compl. ¶¶ 12-13, 15-17.) Second, Bond told Oliver about the "brown shooters" comment, who in turn relayed the threat to her manager. (*Id.* ¶¶ 25, 27.) Finally, forty-five minutes after Glover's dispute, a Pilot employee saw Moultrie arrive at the travel center carrying an object that looked like a gun magazine. (*Id.* ¶¶ 35-36.)

The Supreme Court of Virginia has required a much greater showing of imminent harm for the duty to protect to arise. For example, in *Gupton v. Quicke*, 247 Va. 362, 442 S.E.2d 658 (1994), an assailant threatened the plaintiff inside the defendants' café. The defendants' employees escorted the assailant outside where he again threatened the plaintiff in front of the employees. After the assailant told the employees that he intended to assault the plaintiff, the employees still allowed the assailant to come back inside. The assailant then assaulted the plaintiff. On those facts, the court concluded that the plaintiff adequately pled that the defendants knew "that an assault, which indicated an 'imminent probability of harm' to the plaintiff, was 'about to occur' in the café." *Id.* at 364, 442 S.E.2d at 659 (quoting *Wright*, 234 Va. at 533, 362 S.E.2d at 922).

Here, by contrast, the plaintiffs allege that Oliver's manager and perhaps other employees heard Glover make several threatening comments toward Oliver. The plaintiffs do not allege that

---

[4] As a threshold matter, the plaintiffs sufficiently plead that a special relationship existed between Pilot as a business owner and Bond as an invitee. *See Terry*, 296 Va. at 136, 818 S.E.2d at 792. Before the incident, Bond went into the Wendy's restaurant located inside the travel center, ordered fries, and sat down at a booth in the same manner as any other patron.

Pilot knew anything about Salley's subsequent communications with Moultrie, much less the potential inference that Salley would independently direct Moultrie to go to the travel center to commit a murder.[5] Thus, while the plaintiffs' allegations suggest that Glover, her mother, and her half-brother made a behind-the-scenes plan to commit some crime at the travel center, they do not show that Pilot had any knowledge of that scheme, that the scheme involved more than an assault on Oliver, or that the scheme would result in a murder. In other words, the plaintiffs have not shown that Pilot knew of an "imminent probability of harm" to a customer. *Wright*, 234 Va. at 533, 362 S.E.2d at 922.

Indeed, the Supreme Court of Virginia has emphasized that "the duty to protect against harm from third party criminal acts" arises "[i]n only rare circumstances." *Peterson*, 286 Va. at 359, 749 S.E.2d at 312. Moreover, "[w]ith regard to the criminal act of murder specifically," the court "ha[s] noted that a defendant 'cannot be deemed to have anticipated nor be expected to guard and protect [a plaintiff] against a crime so horrid, and happily so rare, as that of murder.'" *Terry*, 296 Va. at 136, 818 S.E.2d at 792 (third alteration in original) (quoting *Connell's Ex'rs v. Chesapeake & Ohio Ry.*, 93 Va. 44, 58, 24 S.E. 467, 469 (1896)). Unfortunately for the plaintiffs, their allegations do not show that this case is one of the "rare circumstances" in which Virginia law imposes a duty to protect on a business owner.

In sum, the plaintiffs have failed to plead facts showing that Pilot owed a duty to protect Bond. The Court, therefore, will grant Pilot's motion to dismiss.

---

[5] That Tatiyana Wright may have known more is not relevant. Wright was not on duty, had no obligation to tell anyone about what happened outside the restaurant, and did not tell the manager anything.

## III. CONCLUSION

Bond's murder is nothing short of a tragedy. But Pilot is not the culprit behind Bond's death. Because the plaintiffs have failed to plead facts showing that Pilot owed a duty to protect Bond, the Court will grant Pilot's motion to dismiss.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Order to all counsel of record.

Date: <u>7 May 2020</u>
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge